———————————————

No. 21-15668

———————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

D.H., by and through his mother, Janice Hennessy-Waller; and JOHN DOE, by his
guardian and next friend, Susan Doe,
Plaintiff-Appellants,

vs.

JAMI SNYDER,
Defendant-Appellee.

———————————————

On Appeal from Order of the United States District Court
For the District of Arizona
Case No. 4:20-cv-335-SHR

———————————————

**PLAINTIFF-APPELLANTS' OPENING BRIEF**

———————————————

Asaf Orr (CA SBN: 261650)          Brent P. Ray (IL SBN: 6291911)
Shannon Minter (CA SBN: 168907)    King & Spalding LLP
Christopher Stoll (CA SBN: 179046) 353 N. Clark Street, 12th Floor
National Center for Lesbian Rights Chicago, Illinois 60654
870 Market Street, Suite 370       T: +1 312 995 6333
San Francisco, CA 94102            F: +1 312 995 6330
T: +1 415 392 6257                 Email:    bray@kslaw.com
F: +1 415 392 8442
Email:    aorr@nclrights.org
          sminter@nclrights.org
          cstoll@nclrights.org

(Counsel continued on next page)

Counsel continued from previous page:

Daniel C. Barr (AZ SBN: 010149)
Perkins Coie LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email:       dbarr@perkinscoie.com

Abigail K. Coursolle (CA SBN: 266646)
National Health Law Program
3701 Wilshire Boulevard, Suite 750
Los Angeles, CA 90010
T: +1 310 204 6010
Email:       coursolle@healthlaw.org

Attorneys for Plaintiff-Appellants, D.H. and JOHN DOE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................... 1

STATEMENT OF THE ISSUES................................................................ 1

STATEMENT OF THE CASE..................................................................2

SUMMARY OF ARGUMENT ..................................................................6

STANDARD OF REVIEW .......................................................................7

ARGUMENT ..........................................................................................8

    I.    AHCCCS's exclusion violates the Affordable Care Act and Equal Protection Clause. .....................................................8

        A.    The exclusion violates Section 1557 of the Affordable Care Act. ...................................................................8

        B.    The exclusion violates the Equal Protection Clause.................16

    II.    D.H. and John Doe established irreparable harm as a matter of law. ...................................................................................23

        A.    D.H. and John Doe seek a prohibitory injunction. ..................23

        B.    D.H. and John satisfy either standard of irreparable harm. ......25

    III.    The remaining factors of the preliminary-injunction standard tip sharply in favor of D.H. and John Doe. ...............................27

    IV.    The requested injunction would not provide Plaintiffs with full relief...............................................................................30

CONCLUSION .....................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
   632 F. 3d 1127 (9th Cir. 2011) ........................................................................7, 8

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ...........................................................................26

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)...........................................................................................28

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) .............................................................................28

*Bell v. Tavistock*,
   [2020] EWHC 3274 (Admin) ............................................................................22

*Beltran v. Myers*,
   677 F.2d 1317 (9th Cir. 1982) .....................................................................26, 29

*Bostock v. Clayton County, Ga.*,
   140 S. Ct. 1731 (2020)..........................................................6, 8–9, 11, 15–16

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wis. 2018) .....................................9, 11, 15–16, 29

*City of L.A., Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978)...........................................................................................16

*Corbitt v. Taylor*,
   --- F. Supp. 3d ---, 2021 WL 142282 (M.D. Ala. Jan. 15, 2021) ......................22

*C.P. v Blue Cross Shield of Illinois*,
   Case No. 3:20-cv-06145, 2021 WL 1758896, *4
   (W.D. Wash. May 4, 2021)................................................................................12

*Dahl v. HEM Pharmaceuticals, Corp.*,
   7 F.3d 1399 (9th Cir. 1993) ..............................................................................25

*De'lonta v. Johnson*,
708 F.3d 520 (4th Cir. 2013) .........................................................................19, 21

*Diaz v. Brewer*,
656 F.3d 1008 (9th Cir. 2011) .............................................................................23

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ................................................................................8

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 610 (2020) ........19, 21, 25

*Edmo v. Idaho Dep't of Corr.*,
358 F. Supp. 3d 1103 (D. Idaho 2018) ..............................................................20

*Emeldi v. Univ. of Ore.*,
698 F.3d 715 (9th Cir. 2012) ..............................................................................12

*F.V. v. Barron*,
286 F. Supp. 3d 1131 (D. Idaho 2018) ..............................................................17

*Farris v. Seabrook*,
677 F.3d 858 (9th Cir. 2012) ..............................................................................27

*Flack v. Wis. Dep't of Health Servs.*,
331 F.R.D. 361 (W.D. Wis. 2019).......................................................................15

*Flack v. Wis. Dep't of Health Srvcs.*,
395 F. Supp. 3d 1001 (W.D. Wis. 2019) ...............................................22, 23, 29

*Flack v. Wis. Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................10, 13, 15

*Fletcher v. Alaska*,
443 F. Supp.3d 1024 (D. Alaska 2020) ........................................................10, 11

*Franklin v. Gwinnett County Pub. Schs.*,
503 U.S. 60 (1992)..............................................................................................12

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ..........................................................................17

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .........................................................................17, 19

*Hecox v. Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020) ...........................................................17, 20

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ........................................................................24, 25

*Jeldness v. Pearce*,
  30 F.3d 1220 (9th Cir. 1994) ..............................................................................15

*Kadel v. Folwell*,
  446 F. Supp. 3d 1 (M.D.N.C. 2020) ......................................................10, 11, 15

*Kadel v. Folwell*,
  Case No. 19-CV-272 (M.D.N.C. Mar. 11, 2019) ...............................................14

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) .....................................................................6, 8, 17

*Kastl v. Maricopa Cmty. Coll. Dist.*,
  325 Fed. App'x 492 (9th Cir. 2009) ...........................................................6, 8, 14

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ................................................................................7

*Latta v. Otter*,
  771 F.3d 456 (9th Cir. 2014) ..............................................................................18

*M.R. v. Dreyfus*,
  697 F.3d 706 (9th Cir. 2012) ........................................................................26, 29

*Marlyn Nutraceuticals v. Mucos Pharm.*,
  571 F.3d 873 (9th Cir. 2009) ..............................................................................24

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ..............................................................................25

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982)............................................................................................18

*Monroe v. Baldwin*,
424 F. Supp. 3d 526 (S.D. Ill. 2019), *reconsideration den.*, 2020
WL 1048770 (S.D. Ill. Mar. 4, 2020) ................................................19

*Nelson v. NASA*,
530 F.3d 865, 882 (9th Cir. 2008) ....................................................25

*Newton-Nations v. Rogers*,
316 F. Supp. 2d 883 (D. Ariz. 2004) ................................................29

*Nken v. Holder*,
556 U.S. 418 (2009) ..........................................................................27

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015) ................................17, 19, 20

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ..........................................................................18

*Prescott v. Rady Children's Hosp.-San Diego*,
265 F. Supp. 3d 1090 (S.D. Cal. 2017) .............................................13

*Religious Sisters of Mercy v. Azar*,
Case Nos. 3:16-cv-00386, 3:16-cv-00432, 2021 WL 191009
(D.N.D. Jan. 19, 2021) ......................................................................12

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) ......................................................26, 30

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
965 F.3d 945 (9th Cir. 2020) ...............................................................8

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) ......................................................6, 14

*Skidmore v. Swift*,
323 U.S. 134 (1944) ..........................................................................13

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) .............................................................17

*Soneeya v. Spencer*,
851 F. Supp. 2d 228 (D. Mass. 2012) ...............................................19

*Toomey v. Arizona*,
　No. CV-19-00035, 2021 WL 753721 (D. Ariz. Feb. 26, 2021) ........................31

*Tovar v. Essentia Health*,
　342 F. Supp. 3d 947 (D. Minn. 2018).................................................................13

*United States v. Virginia*,
　518 U.S. 515 (1996).......................................................................................18, 22

*Valle del Sol Inc. v. Whiting*,
　732 F.3d 1006 (9th Cir. 2013) ...........................................................................28

*Walker v. Azar*,
　480 F. Supp. 3d 417 (E.D.N.Y. 2020) ...............................................................12

*Whitaker v. Kenosha Unified Sch. Dist. No. 1*,
　858 F. 3d 1034 (7th Cir. 2017) ..........................................................................17

*Zepeda v. I.N.S.*,
　753 F.2d 719 (9th Cir. 1983) .............................................................................28

**Statutes**

42 U.S.C. § 18116(a) ...................................................................................9, 14, 16

**Regulations**

Ariz. Admin. Code R9-22-205...........................................................................1, 2, 9

**Other Authorities**

Am. Acad. of Pediatrics, *Policy Statement: Ensuring Comprehensive
　Care and Support for Transgender and Gender Diverse Children
　and Adolescents*, 142 Pediatrics e20182162 (2018) ...........................................4

Am. Medical Ass'n & Gay and Lesbian Medical Ass'n, *Issue Brief:
　Health insurance coverage for gender-affirming care of
　transgender patients* (2019) ...............................................................................30

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental
　Disorders* (5th ed. 2013) .....................................................................................3

Michael Laidlaw, *The Pediatric Endocrine Society's Statement on Puberty Blockers Isn't Just Deceptive. It's Dangerous*, Public Discourse (2020) ................................................................20

U.S. Dep't of Health & Human Srvcs., Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972 (2021) ...................................13

U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (Aug. 30, 2016) ......................................................21–22

U.S. Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Div., Decision No. 2676 (May 30, 2014) ..........................................21

U.S. Dep't of Justice, Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (2021) ...................................13

World Prof'l Ass'n of Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed. 2011) ............................................................4

## INTRODUCTION

The plaintiffs in this appeal are two teenage boys, D.H. and John, ages eighteen and sixteen, respectively. For several years, D.H. and John have been successfully undergoing medical treatment for gender dysphoria. The care they have received has enabled them to better manage serious depression and anxiety and to improve their health and wellbeing. As a result of their treatment, they have both remained in school, made friends, engaged in social activities, and are on track to become successful adults. But that hard-won progress and the stability they have achieved are imperiled by Arizona Medicaid's exclusion of coverage for all "gender reassignment surgeries." *See* Ariz. Admin. Code R9-22-205(B)(4)(a).

Because of that arbitrary exclusion, D.H. and John are unable to obtain the medical care that is a critical next step in their ongoing treatment for gender dysphoria. With the full support of their parents and healthcare providers, D.H. and John brought this case to challenge this exclusion, which is causing them irreparable harm. As long as the exclusion is enforced, they are barred from obtaining male chest reconstruction surgery—essential medical care that is recognized as safe and effective under the well-established standards of care.

## STATEMENT OF THE ISSUES

1. Did the District Court err as a matter of law by holding that the prohibition of sex discrimination in Section 1557 of the Affordable Care Act does not

prohibit discrimination against transgender people?

2. Did the District Court err as a matter of law by holding that the Equal Protection Clause does not require heightened scrutiny of government policies that discriminate against transgender people?

3. Did the District Court err as a matter of law by requiring Plaintiffs to satisfy the wrong legal standard to obtain a preliminary injunction?

4. Did the District Court err as a matter of law by holding that the denial of medical care does not constitute irreparable harm?

## STATEMENT OF THE CASE

This is a challenge to the categorical exclusion of coverage for "gender reassignment surgeries" under Arizona's Medicaid program, the Arizona Health Care Cost Containment System (AHCCCS). The exclusion is set forth in the Arizona Administrative Code, which prohibits Arizona Medicaid coverage of: "Infertility services, reversal of surgically induced infertility (sterilization), and *gender reassignment surgeries*." Ariz. Admin. Code R9-22-205(B)(4)(a) (emphasis added).

Gender dysphoria is a serious medical condition that can be successfully treated through psychotherapy, hormone therapy, and a variety of surgeries. ER 344–48, ¶¶ 19–32; ER 419–22, ¶¶ 28–39. Gender dysphoria "refers to the distress that may accompany the incongruence between one's experienced or expressed

-2-

gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013). When left untreated or inadequately treated, gender dysphoria predictably results in severe psychological distress and impairment, including suicidality, substance abuse, anxiety, and depression. ER 344 ¶ 21; ER 421, ¶ 36.

The treatment for gender dysphoria is gender reassignment. ER 345, ¶ 22; ER 419–20, ¶¶ 30–31. The protocol for gender reassignment is based on decades of research and clinical practice. ER 345–48, ¶¶ 23–32; ER 421–25, ¶¶ 37–47; *see also* ER 140–49, ¶¶ 8–25; ER 157–60, ¶¶ 15–19. It is well-established and recognized by the medical community to be safe and effective. ER 345–48, ¶¶ 23–32; ER 421–25, ¶¶ 37–47; *see also* ER 140–49, ¶¶ 8–25; ER 157–60, ¶¶ 15–19. The World Professional Association of Transgender Health (WPATH) has published *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("Standards of Care"), which identifies the steps for evaluating and prescribing medical treatments that are necessary as part of the course of care for gender transition. ER 140–41, ¶ 8; ER 345–46, ¶ 23–27; ER 414, ¶ 11. These treatments include mental health care, hormone therapy, and surgery. ER 345, ¶ 22; ER 419–21, ¶¶ 29–35. The Standards of Care have been adopted by the American

Academy of Pediatrics, the American Medical Association, the Pediatric Endocrine Society, and many other medical professional organizations. ER 345, ¶ 26; ER 348, ¶ 32; ER 414, ¶ 11; *see also*, Am. Acad. of Pediatrics, *Policy Statement: Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018), *available at*, https://pediatrics.aappublications.org/content/pediatrics/142/4/e20182162.full.pdf. The Standards of Care apply to adults and minors alike. *See generally* World Prof'l Ass'n of Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed. 2011), *available at*, https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf.

The Plaintiffs, D.H. and John Doe, are two transgender teenage boys who receive health coverage through AHCCCS. ER 452, ¶¶ 1–2; ER 468, ¶¶ 1–2. Each has been diagnosed with gender dysphoria for which gender transition has been prescribed as the only effective treatment. ER 440, ¶ 14; ER 445, ¶¶ 7–8; ER 449, ¶ 8; ER 458–59, ¶¶ 11, 14; ER 464–65, ¶¶ 13–16. Both have been and remain on hormone therapy which is covered by AHCCCS. ER 446, ¶ 9; ER 450, ¶ 10; ER 453 ¶ 13; ER 459, ¶ 14; ER 468–69, ¶¶ 9. In accordance with the established standards of care, D.H. and John's healthcare providers have determined that male chest reconstruction surgery is a necessary part of their care. ER 450–51, ¶ 13–15;

ER 465, ¶ 17.  But, because of the exclusion, AHCCCS is barring D.H. and John from obtaining that surgery, which is causing ongoing, irreparable harm to their emotional and physical health.

On August 6, 2020, Plaintiffs filed suit challenging the exclusion under the Medicaid Act, Section 1557 of the Affordable Care Act, and the Equal Protection Clause.  Along with the complaint, D.H. and John filed a motion to preliminarily enjoin AHCCCS from enforcing the exclusion as to D.H. and John.  Defendant opposed the motion for preliminary injunction, arguing that male chest reconstruction surgery is experimental.

On February 5, 2021, the District Court held oral argument on the motion for preliminary injunction.  On March 30, 2021, following supplemental briefing on the issue of administrative exhaustion, the District Court issued its order denying D.H. and John's motion for preliminary injunction, concluding that they did not meet their burden of demonstrating a likelihood of success on the merits of their Section 1557 and equal-protection claims or establishing irreparable harm.[1]

On April 16, 2021, D.H. and John filed this appeal.  They seek an order

---

[1] The District Court also concluded that, based on the available factual record at the preliminary injunction stage, Plaintiffs had not shown that they were likely to succeed on their claim that the exclusion violates the Medicaid Act's EPSDT and comparability requirements. Plaintiffs do not appeal that portion of the court's ruling, but intend to prove that claim based on the record at trial.

reversing the District Court's decision on their Section 1557 and equal-protection claims and directing entry of the requested preliminary injunction.

## SUMMARY OF ARGUMENT

D.H. and John challenged the exclusion under Section 1557 of the Affordable Care Act ("Section 1557") and the Equal Protection Clause of the Fourteenth Amendment. Based on well-settled law, including the Supreme Court's holding in *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020), and this Court's longstanding precedent in sex discrimination cases involving transgender plaintiffs, D.H. and John alleged that by discriminating against transgender people, the exclusion impermissibly discriminates based on sex. As the Supreme Court held in *Bostock*, "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Id*. at 1741. Even before *Bostock*, this Court has similarly recognized that disparate treatment of transgender people is based on sex. *See*, *e.g*., *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (Equal Protection Clause); *Kastl v. Maricopa Cmty. Coll. Dist*., 325 Fed. App'x 492, 494 (9th Cir. 2009) (Title VII & Title IX); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000) (Gender Motivated Violence Act).

Notwithstanding that precedent, the District Court denied Plaintiffs' motion for a preliminary injunction based on its incorrect conclusion that Section 1557 does not prohibit discrimination against transgender people and that the exclusion does

not warrant heightened scrutiny under the Equal Protection Clause. The District Court also erred by requiring D.H. and John to meet a heightened standard for showing irreparable harm, based on its erroneous conclusion that they sought a mandatory rather than a prohibitory injunction.

D.H. and John ask this Court to reverse and direct the District Court to enter an order preliminarily enjoining Defendant from enforcing the exclusion with respect to D.H. and John so they can be evaluated for the care they need, just as any other beneficiary would be.

## STANDARD OF REVIEW

Plaintiffs are entitled to a preliminary injunction when they establish that (a) they are "likely to succeed on the merits," (b) they are "likely to suffer irreparable harm in the absence of preliminary relief," (c) "the balance of equities tips in [their] favor," and (d) "an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131 (9th Cir. 2011) ("*Alliance*"). These elements are evaluated using a "sliding scale," such that "a stronger showing of one element may offset a weaker showing of another." *Id.*

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Id.* "An abuse of discretion will be found if the district court based its decision 'on an erroneous legal standard or clearly erroneous finding of fact.'" *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en

banc)); *see also East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). The district court's conclusions of law are reviewed *de novo*. *Alliance,* 632 F.3d at 1131.

## ARGUMENT

**I.    AHCCCS's exclusion violates the Affordable Care Act and Equal Protection Clause.**

As the Supreme Court held in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1737 (2020), and as this Court held in *Kastl v. Maricopa Community College District*, 325 Fed. App'x 492, 493 (9th Cir. 2009), and other cases, discrimination because a person is transgender is based on sex. Although acknowledging that the exclusion prevents transgender people from obtaining gender reassignment surgeries, the District Court erroneously held that Section 1557's prohibition on sex discrimination does not prohibit discrimination against transgender people. The District Court also disregarded this Court's holding in *Karnoski v. Trump* that courts must apply heightened scrutiny to government policies that discriminate against transgender people. 926 F.3d 1180, 1200–01 (9th Cir. 2019). Those errors of law warrant reversal and a finding that D.H. and John Doe are likely to succeed on the merits of their Section 1557 and equal-protection claims.

### A.    The exclusion violates Section 1557 of the Affordable Care Act.

Section 1557 of the Affordable Care Act "imposes an affirmative obligation not to discriminate in the provision of health care." *Schmitt v. Kaiser Found. Health*

*Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020). That statute specifically provides that "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). As a recipient of federal funds, AHCCCS must comply with Section 1557. *Id.* To succeed on a sex-discrimination claim under Section 1557, plaintiffs must show that they were denied benefits or otherwise discriminated against based on sex and that the discrimination was a but-for cause of the plaintiff's injury. *See id.*

Under that standard, the exclusion's categorical denial of "gender reassignment surgeries" violates Section 1557. As the Supreme Court explained in *Bostock*, "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741. That analysis applies equally to Section 1557.

Consistent with *Bostock*, the exclusion discriminates based on sex and thus violates Section 1557. AHCCCS's exclusion prohibits coverage of "gender reassignment surgeries," a treatment used exclusively by transgender people. Ariz. Admin. Code R9-22-205(B)(4)(a). As other courts have found, these kinds of coverage exclusions facially discriminate against transgender people. *See*, *e.g*., *Boyden v. Conlin*, 341 F. Supp. 3d 979, 994–98 (W.D. Wis. 2018) (analyzing an

exclusion for "[p]rocedures, services, and supplies related to surgery and sex hormones associated with gender reassignment"); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 12–13, 17 (M.D.N.C. 2020) (analyzing an exclusion for coverage of treatment sought "in conjunction with proposed gender transformation" or "in connection with sex changes or modifications); *Fletcher v. Alaska*, 443 F. Supp.3d 1024, 1030–31 (D. Alaska 2020) (analyzing an exclusion for "[a]ny treatment, drug, service or supply related to changing sex or sexual characteristics"). Just as in those cases, AHCCCS's categorical exclusion of "gender reassignment surgeries" singles out transgender people to deny them a benefit and thus discriminates because of sex.

The exclusion also discriminates based on sex because whether a beneficiary can obtain a particular surgery depends on whether the person is transgender and thus turns directly on the person's natal sex. The district court's analysis of a similar coverage exclusion in *Flack v. Wisconsin Department of Health Services*, 328 F. Supp. 3d 931 (W.D. Wis. 2018) ("*Flack I*") is equally applicable here. In *Flack*, the court held that Wisconsin's Medicaid program violated Section 1557 by denying coverage for "transsexual surgery" and treatments related to such surgery. As the court explained:

> [I]f plaintiffs' natally assigned sexes had *matched* their gender identities, their requested, medically necessary surgeries to reconstruct their genitalia or breasts would be covered by Wisconsin Medicaid. Here, plaintiffs have instead been denied coverage because of their natal sex,

> which would appear to be a straightforward case of sex
> discrimination.

*Id.* at 948; *see also Boyden*, 341 F. Supp. 3d at 997 (same); *Kadel*, 446 F. Supp. 3d at 12–13 (same); *Fletcher*, 443 F. Supp.3d at 1030–31 (finding "defendant's policy of excluding coverage for medically necessary surgery such as vaginoplasty and mammoplasty for employees, such a plaintiff, whose natal sex is male while providing coverage for such medically necessary surgery for employees whose natal sex is female is discriminatory on its face and is direct evidence of sex discrimination.").

AHCCCS's exclusion for "gender reassignment surgeries" is no different. The exclusion denies coverage for surgeries based on a patient's natal sex. For example, before approving coverage for the surgery D.H. and John seek, AHCCCS considers the beneficiary's natal sex. If the beneficiary's natal sex is male and the surgery is medically necessary to treat gynecomastia, the surgery will be covered; if the beneficiary's natal sex is female and the surgery is medically necessary for gender transition, it will not. As in *Bostock*, "[s]ex plays a necessary and undisguisable role in the decision." 140 S. Ct. at 1737.

The District Court recognized that the exclusion targets transgender people, but erroneously held that such discrimination is not based on sex because "[t]he Supreme Court expressly limited its holding to Title VII claims." ER 017. While *Bostock* addressed only a Title VII claim, the Supreme Court's recognition that

discrimination against transgender people is inherently sex-based applies to Section 1557 as well. That is true not only because the straightforward analysis of this issue in *Bostock* applies with equal force to Section 1557, but also because Section 1557 expressly incorporates Title IX's prohibition against sex discrimination. It is well established that courts must construe Title IX's protections consistently with Title VII; the same is necessarily true of Section 1557, which incorporates Title IX by direct reference. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992) (holding that Title IX and Title VII must be construed consistently); *Emeldi v. Univ. of Ore.*, 698 F.3d 715, 724 (9th Cir. 2012) (same).

For this reason, courts across the country have held that the Supreme Court's analysis of sex discrimination in *Bostock* applies equally to Section 1557. For example, in *C.P. v Blue Cross Shield of Illinois*, the court held that an insurance plan that excluded gender-confirmation surgery for transgender minors violated Section 1557: "It would be logically inconsistent with *Bostock* to find that Title IX [and thus 1557] permits discrimination for being transgender." Case No. 3:20-cv-06145, 2021 WL 1758896, *4 (W.D. Wash. May 4, 2021); *see also Walker v. Azar*, 480 F. Supp. 3d 417, 429 (E.D.N.Y. 2020) (holding that *Bostock* made clear that "Title IX—and, by implication, § 1557—prohibited discrimination based on gender identity and sex stereotyping"); *Religious Sisters of Mercy v. Azar*, Case Nos. 3:16-cv-00386, 3:16-cv-00432, 2021 WL 191009, *15 (D.N.D. Jan. 19, 2021) (finding likelihood that

Section 1557 prohibits discrimination against transgender people based on *Bostock* and Eighth Circuit precedent requiring Title IX and Title VII to be interpreted consistently).[2]

The United States Department of Justice and Department of Health and Human Services concur that, in light of *Bostock*, discrimination against transgender people is a form of sex discrimination under Title IX and Section 1557. U.S. Dep't of Health & Human Srvcs., Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, at 3 (2021), *available at*, https://www.hhs.gov/sites/default/files/ocr-bostock-notification.pdf; U.S. Dep't of Justice, Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972, at 1–2 (2021), *available at*, https://www.justice.gov/crt/page/file/1383026/download. This form of agency guidance is "entitled to respect" from a reviewing court. *Skidmore v. Swift*, 323 U.S. 134, 140 (1944).

In addition, even before *Bostock* was decided, this Court held that Title IX

---

[2] Even before *Bostock*, courts held that Section 1557 prohibits discrimination against transgender people. *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–99 (S.D. Cal. 2017) (looking to Title IX and Title VII precedent in holding that Section 1557 prohibits discrimination against transgender people); *Flack I*, 328 F. Supp. 3d 931, 947–951 (W.D. Wis. 2018) (same); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 952–953 (D. Minn. 2018) (same).

prohibits discrimination against transgender people. *See Kastl*, 325 Fed. App'x at 493–94; *see also Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000) (holding Gender Motivated Violence Act protects transgender people and recognizing that such discrimination is also prohibited by Title VII). Thus, even if *Bostock* had no application beyond Title VII, the District Court would be bound by this Court's precedent given the express incorporation of Title IX's antidiscrimination provision in Section 1557.

The District Court also erred by seeking to distinguish other Section 1557 cases invalidating similar exclusions of coverage for transition-related care, based on the type of insurance plan at issue or the age of the plaintiffs. ER 018–19. Neither provides a basis for distinguishing those cases. The defendants in *Flack*, *Boyden*, and *Kadel* were required to comply with Section 1557—as is AHCCCS—because they receive federal funds. Nothing in those decisions suggests that Section 1557 applies differently to state-sponsored private health plans than to Medicaid programs; such a conclusion is contrary to the plain language of Section 1557, which makes no distinction among such plans. *See* 42 U.S.C. § 18116(a).

Similarly, the decisions do not turn on the plaintiffs being adults, but rather solely on their transgender status. Two of the plaintiffs in *Kadel* were thirteen and sixteen, and the class in *Flack* covered all Medicaid beneficiaries, regardless of age. *See* Complaint, *Kadel v. Folwell*, Case No. 19-CV-272, at ¶¶ 8, 10 (M.D.N.C. Mar.

11, 2019); *Flack v. Wis. Dep't of Health Servs.*, 331 F.R.D. 361, 368 (W.D. Wis. 2019). Nothing in the language of Section 1557 supports the District Court's age-based distinction.

The District Court also erred by holding that D.H. and John must provide additional proof, beyond the terms of the exclusion itself, that AHCCCS intended to discriminate against transgender Medicaid beneficiaries based on sex. ER 019. When the exclusion itself imposes disparate treatment based on a protected trait, further proof of hostility or ill will is not required. *See Jeldness v. Pearce*, 30 F.3d 1220, 1231 (9th Cir. 1994) ("[T]he absence of discriminatory *motive* does not transform a policy which discriminates on its face into a neutral policy with only a discriminatory effect."); *see also Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1742 (2020) ("There is simply no escaping the role intent plays here: … an employer who discriminates on [the basis of sexual orientation and gender identity] inescapably *intends* to rely on sex in its decisionmaking.").

Similarly, it is irrelevant that the scope of the exclusion is limited to surgical treatment or that AHCCCS covers other treatments for transgender people, such as mental health care and hormones. The legal analysis in *Boyden*, *Flack*, and *Kadel* did not turn on whether the exclusion encompassed all transition-related care, but on the facially discriminatory terms of each exclusion. *See Boyden*, 341 F. Supp. 3d at 997; *Flack I*, 328 F. Supp. 3d 947–49; *Kadel*, 446 F. Supp. 3d at 12–14, 17. The

exclusion here is no less discriminatory than the exclusions challenged in *Boyden*, *Flack*, and *Kadel*.

It is also irrelevant that not every transgender person requires gender reassignment surgeries. As the district court correctly explained in *Boyden*, an exclusion "need not injure *all* members of a protected class for it to constitute sex discrimination." 341 F. Supp. 3d at 996 (emphasis in original); *see also Bostock*, 140 S. Ct. at 1740–41 (emphasizing that "our focus should be on individuals, not groups"); *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 709 (1978) (same); 42 U.S.C. § 18116(a) ("an *individual* shall not … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity.") (emphasis added).

The District Court disregarded this controlling law when it ruled against D.H. and John Doe on their Section 1557 claim. This error warrants reversal.

## B. The exclusion violates the Equal Protection Clause.

Plaintiffs are also likely to succeed on the merits of their equal-protection claim, and the District Court erred in holding otherwise.

The exclusion here warrants heightened scrutiny because it classifies based on transgender status, and thus on sex, for the same reasons described in Section I.A., *supra*. Contrary to the District Court's analysis, this Court has already applied heightened scrutiny under the Equal Protection Clause to government policies that

discriminate against transgender people. For example, in *Karnoski v. Trump*, this Court applied intermediate scrutiny to the prior administration's policy of banning transgender people from military service. 926 F.3d 1180, 1200–01 (9th Cir. 2019); *see also Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) (noting *Karnoski* mandates heightened scrutiny for laws that discriminate against transgender people). In summarily rejecting Plaintiffs' equal-protection claim, the District Court failed even to mention *Karnoski*, much less to follow it.

The exclusion also warrants heightened scrutiny because discrimination against transgender people is based on sex, as many courts recognized even prior to *Bostock*. *See*, *e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020) (gathering cases); *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F. 3d 1034, 1051–52 (7th Cir. 2017) (finding school policy requiring transgender students to use separate restrooms "is inherently based upon a sex-classification and heightened review applies"); *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011) (holding discrimination because a person is transgender is sex discrimination for purposes of equal protection claim); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (same); *see also F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142–44 (D. Idaho 2018) (holding that discrimination based on transgender status warrants heightened scrutiny both as an independent classification and because it is based on sex); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (same).

Whether considered as an independent transgender classification or as a classification based on sex, the exclusion warrants, and fails, heightened scrutiny. To survive constitutional scrutiny, a discriminatory policy must have an "exceedingly persuasive justification." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723–24 (1982) (internal citation omitted). That burden is "demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). The justification must be "genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* Moreover, "policies that facially discriminate on the basis of sex need not separately show either 'intent' or 'purpose' to discriminate." *Latta v. Otter*, 771 F.3d 456, 481 (9th Cir. 2014) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277–78 (1979)).

The District Court disregarded this settled law. Rather than requiring AHCCCS to meet its heavy burden of proving that the exclusion is supported by an "exceedingly persuasive justification," as the law requires, the District Court improperly put the burden on plaintiffs to rebut any possible justification, no matter how transparently pretextual or unsupported. But as a matter of law, that burden rested entirely on AHCCCS, and it plainly failed to meet that exacting standard.

The main justification proffered by AHCCCS was that male chest reconstruction surgery is "experimental," ER 287, notwithstanding its longstanding inclusion as a safe, effective, and medically necessary procedure in the prevailing

-18-

standards of care for the treatment of transgender individuals. As this Court and many others have recognized, the Standards of Care developed by the World Professional Association of Transgender Health (WPATH) are evidence-based and represent "the consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals." *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 610 (2020); *Norsworthy*, 87 F. Supp. 3d at 1170; *Grimm*, 972 F.3d at 596–97; *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 530 (S.D. Ill. 2019), *reconsideration den.*, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231–32 (D. Mass. 2012). As this Court has noted, "[t]here are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Edmo*, 935 F.3d at 769 (cleaned up).

Far from "exceedingly persuasive," Defendant's attempt to counter that medical and legal consensus was legally insufficient under any standard of review. The only evidence Defendant proffered was the written testimony of two physicians who simply disagree with the prevailing standards of care for the treatment of transgender people. They did not dispute that the WPATH Standards of Care recognize male chest reconstruction surgery as a safe, effective, and medically necessary treatment for some transgender minors, nor did they dispute that those

standards of care have been endorsed and adopted by the nation's leading medical and mental health professional organizations. Instead, they voiced their personal disagreement with those standards. For example, Dr. Laidlaw opined that male chest reconstruction surgery is never medically necessary for transgender people and disagrees with AHCCCS's decision to cover other medical treatments for gender dysphoria. ER 264–65, ¶ 40; ER 169 (citing Michael Laidlaw, *The Pediatric Endocrine Society's Statement on Puberty Blockers Isn't Just Deceptive. It's Dangerous*, Public Discourse (2020), *available at*, https://www.thepublicdiscourse.com/2020/01/59422/). Likewise, Dr. Levine advocates subjecting transgender youth to conversion therapy, a practice that has been roundly rejected as unethical and dangerous by major associations of medical and mental health professionals. ER 156–57, ¶ 14. Because he is such an outlier in the field, several courts have previously declined to rely on or given little weight to expert testimony submitted by Dr. Levine. *See Hecox*, 479 F. Supp. 3d at 977 n.33 (D. Idaho 2020); *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125–26 (D. Idaho 2018); *Norsworthy*, 87 F. Supp. 3d at 1188. As a matter of law, such personal disagreement with the prevailing medical standards of care is insufficient to show that an established medical treatment is "experimental" even under rational basis review, much less under the heightened review applicable here. *See*, *e.g*., *Edmo*, 935 F.3d at 769 (recognizing absence of any evidence-based alternative to the WPATH

Standards of Care, which recognize gender reassignment surgeries generally and male chest reconstruction specifically as safe, effective, and well-established treatments); *see also id.* at 770 (stating that "sex reassignment surgery" "is not considered experimental" and "is an accepted, effective, medically indicated treatment for [gender dysphoria]") (citing *De'Lonta*, 708 F.3d at 523).

In the absence of any evidence-based standards to support their personal views, Defendant's experts relied on a 2016 final decision memo in which the Centers for Medicare & Medicaid Services ("CMS") declined to issue a National Coverage Determination on gender reassignment surgery for Medicare beneficiaries with gender dysphoria. In 2014, CMS overturned Medicare's categorical exclusion of coverage for surgical treatment for gender dysphoria—one comparable to the exclusion challenged here—and began covering those surgeries on a case-by-case basis. Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Div., Decision No. 2676 at 1 (May 30, 2014), https://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf. Two years later, in the decision referenced by Dr. Laidlaw, CMS simply declined to create affirmative national mandatory coverage standards for those surgeries, opting to keep making those coverage determinations on a case-by-case basis, just as the plaintiffs seek here. U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., Decision Memo for Gender Dysphoria and Gender Reassignment Surgery 57 (Aug.

30, 2016).[3]   Contrary to the District Court's analysis, the CMS decisions support rather than undermine plaintiffs' claims here.

Defendant's claim that the exclusion is justified because male chest reconstruction surgery is "experimental" also fails because there is no evidence whatsoever that AHCCCS relied on that rationale when it first adopted the exclusion. *See Flack v. Wis. Dep't of Health Srvcs.*, 395 F. Supp. 3d 1001, 1021–22 (W.D. Wis. 2019) ("*Flack II*") (granting summary judgment for plaintiffs on equal protection claim due to lack of evidence of justification at the time of enactment); *see also Corbitt v. Taylor*, --- F. Supp. 3d ---, 2021 WL 142282, at *9–10 (M.D. Ala. Jan. 15, 2021) (rejecting alleged justification for excluding transgender people from correcting the sex designation on their driver's license because state failed to provide evidence the proffered justification was considered at the time the policy was created).   On that basis alone, the District Court should have concluded that AHCCS failed to meet its burden.  *See VMI*, 518 U.S. at 533 (under heightened scrutiny an asserted justification for a discriminatory policy must be "genuine, not hypothesized

---

[3] The District Court also erroneously relied on the United Kingdom case of *Bell v. Tavistock*, [2020] EWHC 3274 (Admin), which has no relevance to the issues here. That case addressed whether minors can consent to puberty-blocking medications without parental consent.  D.H. and John assert no such claim here.  D.H. recently turned eighteen and both Plaintiffs' legal guardians support their attempts to obtain surgery.

or invented *post hoc* in response to litigation").

Finally, Defendant's suggestion that the exclusion is justified by cost savings is equally unavailing. ER 287. This Circuit previously held that cost savings at the expense of a vulnerable population cannot satisfy even rational basis, let alone heightened scrutiny. *See Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011); *see also*, *Flack II*, 395 F. Supp. 3d at 1021–22 ("[R]emoving the Challenged Exclusion and covering gender-confirming surgeries would … amount[] to one hundredth to three hundredth[s] of one percent of the State's share of Wisconsin Medicaid's annual budget.").

Under *Karnoski* and the other controlling precedents that govern this case, D.H. and John showed that the exclusion warrants, and cannot survive, heightened scrutiny under the Equal Protection Clause. The District Court erred in concluding otherwise.

## II.   D.H. and John Doe established irreparable harm as a matter of law.

The District Court incorrectly imposed a heightened standard of irreparable harm. Moreover, even if the requested injunction was a mandatory injunction (which it was not, for the reasons described below), D.H. and John established very serious irreparable harm, and it was an abuse of discretion to hold otherwise.

### A. D.H. and John Doe seek a prohibitory injunction.

The District Court erred as a matter of law in requiring Plaintiffs to satisfy the

more demanding standard of proof applicable to mandatory injunctions. The injunction Plaintiffs sought is a prohibitory injunction barring application of the challenged exclusion, not a mandatory one.

This Circuit distinguishes between injunctions that prevent future unlawful conduct and those that require a party to take a particular action. *Hernandez v. Sessions*, 872 F.3d 976, 998–99 (9th Cir. 2017). A party seeking the latter type of injunction must further demonstrate that the merits of the case are not "doubtful" and the irreparable harm will be "extreme or very serious." *Marlyn Nutraceuticals v. Mucos Pharm.*, 571 F.3d 873, 878–79 (9th Cir. 2009).

Here, the purpose of the injunction is to ensure that when D.H. and John request prior authorization for coverage for male chest reconstruction surgery, AHCCCS evaluates those requests as it does requests for other Medicaid services. D.H. and John do not seek to compel AHCCCS to take a particular action, but merely to cease enforcing their unlawful exclusion and follow their ordinary practice for other Medicaid services. Enjoining AHCCCS from enforcing the exclusion to deny D.H. and John coverage for male chest reconstruction surgery based on a blanket policy, without undertaking any individualized assessment, would merely "prevent[] future constitutional violations, a classic form of prohibitory injunction." *Hernandez*, 872 F.3d at 998.

Even if the injunction Plaintiffs sought could properly be characterized as a

mandatory injunction, the evidence they presented was more than sufficient to satisfy that standard. In *Dahl v. HEM Pharmaceuticals, Corp.*, this Circuit held that denying patients additional doses of an experimental medication after the conclusion of a clinical drug trial, where the participants believed the medication alleviated their condition, satisfied the mandatory-injunction standard. 7 F.3d 1399, 1403–04 (9th Cir. 1993). As detailed below D.H. and John are likely to experience significant and irreparable harm absent an injunction that is, at a minimum, equivalent to the harms experienced by the plaintiffs in *Dahl*. Likewise, this is not a "doubtful" case on the merits. The exclusion explicitly discriminates against transgender Medicaid beneficiaries based on sex, for which there is no legally adequate justification.

The District Court's failure to apply the correct preliminary-injunction standard warrants reversal.

### B. D.H. and John satisfy either standard of irreparable harm.

D.H. and John have established irreparable injury because the challenged exclusion violates the Equal Protection Clause. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009). "[C]onstitutional violations cannot be adequately remedied through damages." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (quoting *Nelson v. NASA*,

530 F.3d 865, 882 (9th Cir. 2008)).  Having demonstrated a likelihood of success on the merits of their equal-protection claim, D.H. and John have also satisfied the irreparable-harm element for obtaining a preliminary injunction as a matter of law. *See id.*

In addition, D.H. and John are being severely and irreparably harmed by being barred from obtaining essential medical care.  This Circuit has repeatedly recognized that delaying or denying a person "needed medical" care is irreparable harm. *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982); *see also M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012) (holding loss of services that "relate intimately to [plaintiffs'] mental and physical health" is irreparable harm); *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (holding irreparable harm includes denial or delay of necessary treatment as well as increased pain and medical complications).  Both D.H. and John presented a wealth of evidence that inability to obtain essential medical care is causing them serious and irreparable harms that will have a lasting negative impact on their health and well-being. *See, e.g.*, ER 134–36, ¶¶ 5, 7, 9–11; ER 445–47, ¶¶ 6, 13–14; ER 450–51, ¶¶ 12–17; ER 455, ¶¶ 14–15; ER 458–60, ¶¶ 13, 16–21; ER 465–66, ¶¶ 16, 19; ER 468–70, ¶¶ 5, 12–14.

The District Court also erred in finding that D.H.'s and John's injuries could be compensable.  The District Court concluded that "it is not clear 'the injury complained of is [not] capable of compensation in damages,' as Plaintiffs here could

potentially pay for the surgeries out-of-pocket and be reimbursed by Defendant if they prevail on the merits of their claims." ER 021 (quoting Order Denying Motion for Preliminary Injunction, Doc. 162, *Toomey v. Arizona*, Case No. CV-19-35-TUC-RM, at 10 (D. Ariz. Feb 26, 2021)). But unlike the university professor in *Toomey*, D.H. and John receive health insurance through AHCCCS, a means-tested program that serves low-income families. Neither D.H. nor John are able to afford male chest reconstruction surgery and cannot undergo the procedure if AHCCCS does not provide coverage. ER 451, ¶ 16; ER 465, ¶ 18. Defendant did not contest that evidence. Relying on D.H.'s and John's alleged ability to pay for male chest reconstruction surgery was clearly erroneous.

### III.   The remaining factors of the preliminary-injunction standard tip sharply in favor of D.H. and John Doe.

Because of its conclusions regarding D.H. and John's likelihood of success on the merits and irreparable harm, the District Court declined to analyze the remaining factors of the preliminary-injunction standard: the balance of harms and the public interest. As a result, this Circuit reviews those factors *de novo*. *Farris v. Seabrook*, 677 F.3d 858, 865 (9th Cir. 2012).

When seeking an injunction against a governmental entity, the balance-of-harms and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). More specifically, the government "cannot reasonably assert that it is harmed in any legally cognizable sense" by an injunction that prohibits it from violating federal

law. *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law." (cleaned up)). That leaves the court to "'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Arc of Cal. v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). Here, those factors weigh heavily in favor of granting D.H. and John's requested injunction.

As described above and in the extensive declarations accompanying their motion for preliminary injunction, permitting AHCCCS to continue enforcing the exclusion will subject D.H. and John to very serious irreparable injuries to their physical and emotional health. Indeed, the record is replete with examples of irreparable injuries both D.H. and John have already suffered as a result of their inability to obtain male chest reconstruction surgery due to the challenged exclusion.

Below, AHCCCS advanced only three countervailing considerations, none of which have merit: (1) male chest reconstruction surgery is irreversible and carries risk; (2) covering the surgery will be expensive; and (3) the surgery has not been proved to be safe or effective. ER 287–88. None of those harms are sufficient to counterbalance, let alone outweigh, the harms to D.H. and John. Chest

reconstruction surgery is no more irreversible than many other surgeries covered by AHCCCS and, under the prevailing standards of care, it is prescribed only when a patient's treating healthcare professionals determine that it is medically necessary, based on a careful, individualized assessment of the patient's specific medical needs. By categorically precluding gender reassignment surgeries for all transgender beneficiaries, the exclusion does not protect transgender patients from risk; rather, it improperly denies them medically necessary care.

Nor does the cost of covering the surgery shift the balance of equities. This Circuit has repeatedly held that access to medically necessary care for Medicaid beneficiaries and people with disabilities outweighs budgetary concerns. *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 737–38 (9th Cir. 2012); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982); *see also Newton-Nations v. Rogers*, 316 F.Supp.2d 883, 888 (D. Ariz. 2004). And, even if the requested injunction resulted in D.H. and John obtaining coverage for male chest reconstruction surgery, the total cost of those two surgeries would be negligible, at best. *See, e.g.*, *Boyden v. Conlin*, 341 F. Supp. 3d 979, 990 (W.D. Wis. 2018) (defense expert estimating per member cost of removing transgender care exclusion for all state employees between $0.04-$0.10 per month); *Flack II*, 395 F. Supp. 3d 1001, 1008 (W.D. Wis. 2019) (holding added cost of coverage for all transgender-related medical care for all transgender Medicaid beneficiaries in Wisconsin is "actuarially immaterial"). If anything, providing

transgender patients with medically necessary gender reassignment surgeries would almost certainly reduce, rather than increase, AHCCCS's costs by precluding the need for palliative mental health care to address the harms caused by failing to provide adequate medical treatment. *See* Am. Medical Ass'n & Gay and Lesbian Medical Ass'n, *Issue Brief: Health insurance coverage for gender-affirming care of transgender patients* 3 (2019), *available at*, https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf; *see also Rodde*, 357 F.3d at 999 (noting that projected-savings calculations must consider increased cost of alternate services).

AHCCCS's claim regarding the safety and efficacy of male chest reconstruction surgery has no merit. As discussed above, that surgery is part of the well-established standards of care, which recognize that it is both safe and effective. *See*, *supra*, Section I.B.

The severity of the harms to D.H.'s and John's health and wellbeing, as well as the public interest in eliminating discriminatory barriers to medically necessary care, tip the balance of equities strongly in favor of D.H. and John.

## IV. The requested injunction would not provide Plaintiffs with full relief.

The District Court erred in denying D.H. and John's motion for preliminary injunction on the ground that it would provide Plaintiffs with complete relief. ER 021. It would not. D.H. and John's complaint seeks a permanent injunction of the

exclusion and a declaratory judgment that AHCCCS's enforcement of that exclusion violate the Medicaid Act and federal sex-discrimination protections. D.H. and John seek that relief on behalf of themselves and a putative class of similarly situated transgender Medicaid beneficiaries.

The motion for preliminary injunction, however, is significantly narrower than the relief sought in the complaint. ER 517–18. The requested injunction was limited to D.H. and John. It would not benefit any putative class members. *Cf. Toomey v. Arizona*, No. CV-19-00035, 2021 WL 753721, at *6 (D. Ariz. Feb. 26, 2021) (denying preliminary injunction on behalf of named plaintiff and certified classes, in part, because the injunction would have provided full relief). The injunction will simply ensure that AHCCCS must assess D.H.'s and John's request for male chest reconstruction surgery based on medical necessity. As a result, granting D.H. and John's requested injunction will not provide them "full relief" or obviate the need for further litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to reverse the District Court's order and remand with instructions to enter a preliminary injunction in Plaintiffs' favor.

DATED: MAY 14, 2021      Respectfully submitted,

  /s/ Asaf Orr
Asaf Orr
Shannon Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
T: +1 415 392 6257
F: +1 415 392 8442
Email:     aorr@nclrights.org
          sminter@nclrights.org
          cstoll@nclrights.org

Brent P. Ray
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email:     bray@kslaw.com

Daniel C. Barr
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email:     dbarr@perkinscoie.com

Abigail K. Coursolle
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 750
Los Angeles, CA 90010
T: +1 310 204 6010
Email:     coursolle@healthlaw.org

*Attorneys for Plaintiff-Appellants*

## <u>STATEMENT OF RELATED CASES</u>

There are no related cases pending in this Court.

DATED:  MAY 14, 2021          Respectfully submitted,

  /s/ Asaf Orr                                   
Asaf Orr
Shannon Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
T: +1 415 392 6257
F: +1 415 392 8442
Email:      aorr@nclrights.org
               sminter@nclrights.org
               cstoll@nclrights.org

Brent P. Ray
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email:      bray@kslaw.com

Daniel C. Barr
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email:      dbarr@perkinscoie.com

Abigail K. Coursolle
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 750
Los Angeles, CA 90010
T: +1 310 204 6010
Email:        coursolle@healthlaw.org

*Attorneys for Plaintiff-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  21-15668

I am the attorney or self-represented party.

**This brief contains  7,278  words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/Asaf Orr                              **Date**    05/14/2021

*(use "s/[typed name]" to sign electronically-filed documents)*